FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

02 SEP 30 PM 3: 59

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| KENNETH CHARLES EADY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-00-B-2674-S |
| | ) | |
| | ) | |
| AMERICAN CAST IRON PIPE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

SEP 3 0 2002

### MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by Defendant American Cast Iron Pipe Company ("defendant" or "ACIPCO"). Kenneth Charles Eady, ("plaintiff" or "Eady") filed suit alleging that defendant discharged him with the purpose of interfering with his right to benefits under an employee benefit plan, in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et. seq.* The plaintiff also alleged state law claims for assault and battery, and outrage over which the court exercised supplemental jurisdiction.[1] Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.

---

[1]    In Plaintiff's Response to Defendant's Motion for Summary Judgment, plaintiff moved for a dismissal of his state law claims of assault and battery, and outrage with prejudice. Therefore, plaintiff's assault and battery and outrage claims are due to be dismissed with prejudice.

59

# I. <u>FACTUAL SUMMARY</u>[2]

## A.    Background Facts

Plaintiff began working at ACIPCO in 1973 as a general laborer.  (Pl. Dep. at 23-24.)

Although plaintiff held a number of jobs with ACIPCO over the years, for the last three to four

years of his employment with ACIPCO, plaintiff worked the night shift as a Hot Metal Crane

Operator.  (*Id.*)   In that position, plaintiff operated a crane that transported hot metal from one

area of the melting department to another area of the melting department.  (Pl. Dep. at 29-30.)

Plaintiff's immediate supervisor was Leon Hice, who reported to Ken Wheeler.  (Pl. Dep. at 25.)

Ken Wheeler reported to Charles Tuggle, Superintendent in the Melting Department.  (Pl. Dep.

at 25; Tuggle Aff. Attached to Def.'s Mot. for Summ. J.)   Ron Kern served as Charles Tuggle's

assistant. (Pl. Dep. at 57.)

## B.    Company Rules

When plaintiff was hired, defendant provided a copy of ACIPCO's Plant Rules to him.

(Pl.'s Dep. at 30.)  Rule Number Four prohibits "[a]ssault of fellow employee with fist or bodily

force."  (Exh. 1 to Pl. Dep.)  The first violation of this rule normally results in a four-week

suspension while a second violation typically results in discharge.  (*Id.*)   In the late 1970's,

ACIPCO suspended plaintiff under Rule Four after a physical altercation with a co-worker.  (Pl.

Dep. at 31-33.)  Plant Rule Number Seven prohibits "[f]alsification of employment, personal, or

company records or making false report or providing false information which could increase

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See e.g., Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1315 (11th Cir. 2000).

company cost or liability, including but not limited to unfounded claims for unemployment compensation." (Exh. 1 to Pl. Dep.)

## C.    February 2000 Altercation

Beginning in 1996, plaintiff experienced personality problems with a co-worker, Mike Jensen.[3] (Pl. Dep. at 34; Exh. 6 to Pl. Dep. at 2.) Plaintiff eventually reported to ACIPCO that Jensen routinely cursed him at work, and ACIPCO issued Jensen a written warning to discontinue his behavior. (Pl. Dep. at 37-39; Exh 2 to Pl. Dep.) Jensen continued his behavior, and plaintiff complained again. (Pl. Dep. at 39-43.) ACIPCO investigated but was unable to confirm plaintiff's allegations. (*Id.*) ACIPCO warned the two to avoid contact with each other while at work. (*Id.*) In February 2000, plaintiff and Jensen were involved in a physical altercation over the use of the microwave in the Plant's break room. (Pl. Dep. at 45-48.) Plaintiff complained about the altercation, and ACIPCO conducted a full investigation. (Pl. Dep. at 45-51.) The Threat Response Team[4] investigated the incident, and following the investigation, the Committee for Handling Company Rule Violations ("Discipline Committee")[5]

---

[3] Jensen disputes the origin of the animosity between him and plaintiff, but admits that it was not work-related. (Exh. 6 to Pl. Dep. at 2.)

[4] The Threat Response Team investigates incidents that may involve threatening conduct or intimidating behavior. (Barr Aff. ¶ 2.)

[5] The Discipline Committee is comprised of non-management employees and representatives from management. (Barr Aff. ¶ 3.) The purpose of the Committee is to investigate and make decisions regarding alleged violations of plant rules. (*Id.*) Members of non-management meet with the employee to collect information on the alleged rule violation as part of the investigation. (*Id.*) Once an investigation has been conducted, the Discipline Committee votes on what, if any, discipline should be imposed. (*Id.*)

suspended both plaintiff and Jensen for four weeks for violating Plant Rule Number Four.[6]  (Barr

Aff. ¶ 4; Pl. Dep. at 57-59; Exh. 7 to Pl. Dep.)

**D.      Placement Of Plaintiff On Sick Leave**

While plaintiff was on suspension, Dr. J. W. Pitts, the Medical Director at ACIPCO,[7]

treated plaintiff for fatigue.  (Exh. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J; Pitts Aff.,

attached to Def.'s Mot. for Summ. J.)  Plaintiff originally complained of fatigue in August 1979

and subsequently complained of fatigue to Dr. Pitts in 1995, 1996, or 1997.  (Pl. Dep. at 70-75.)

Dr. Pitts diagnosed plaintiff with thyroid dysfunction in October 1997.  (*Id.*)  Dr. Pitts placed

plaintiff on medical leave on March 14, 2000.  (Pl. Dep. at 78.)

Plaintiff remained on sick leave for the next four months, and he followed up with Dr.

Pitts with complaints that he continued to experience significant problems with his energy level.[8]

(Pl. Dep. at 79-82.)  Dr. Pitts referred plaintiff to Dr. Ronald Stroud[9] for a second opinion.

(Exh. 11 to Pl. Dep.)  Dr. Stroud confirmed Dr. Pitts's diagnosis of hypothryoidism and chronic

fatigue syndrome.  (Pl. Exh. 3.)

---------------

[6]      An employee can ask the President of ACIPCO or the Board of Management to overturn a vote of the Discipline Committee.  (Albright Dep. at 28-29.)  Plaintiff appealed the vote to Van Richey, President of ACIPCO, but the vote of the Discipline Committee was not disturbed.  (Eady Aff. ¶ 4, 5.).)

[7] ACIPCO operates a medical department on the premises for injured and sick employees.  (Pl. Dep. at 71.)

[8]  During this time period, plaintiff was also being treated by Dr. Hagemeyer at Birmingham Psychiatry for severe depression.  (Dr. Hagemeyer's Decl., Exh. 5 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)

[9]  Dr. Ronald Stroud was a treating doctor at ACIPCO's on-site Medical Department.  (Pl. Dep. at 114.)

**E.     Report That Plaintiff Was Holding Other Employment**

In July 2000,  Lean Barr, ACIPCO's Director of Human Resources, learned that plaintiff might be holding other employment while on medical leave. (Barr Aff. ¶ 5.)  Based on the report that plaintiff was holding other employment and the fact that plaintiff had been on sick leave for four months, Barr began an investigation into plaintiff's actions to determine if he had been providing ACIPCO with false information about his physical capabilities.  (*Id.*)  If plaintiff was providing false information to ACIPCO and its doctors to gain sick pay, plaintiff would be in violation of Plant Rule Seven.[10]  (Exh. 1 to Pl. Dep.)

**F.     Investigation Into Plaintiff's Actions**

**1.     Surveillance of Plaintiff**

Barr arranged for surveillance of plaintiff's activities from July 14, 2000, through July 21, 2000.  (Barr Aff. ¶ 5.)  Surveillance revealed that plaintiff cleaned box fans in temperatures near or exceeding 100 degrees, restocked shelves and emptied trash at a local convenience store, sunbathed at a community swimming pool, shopped at local drug, discount, and grocery stores, mowed and edged his lawn, and cleaned his driveway, gutters, eaves, and truck mats in temperatures near or exceeding 100 degrees.[11]  (Barr Aff. ¶ 6; Exh. B. to Barr Aff.)  According to

---

[10]     Plant Rule Seven provides:

> [f]alsification of employment, personal, or company records or making false report or providing false information which could increase Company cost or liability; including but not limited to unfounded claims for unemployment compensation.

[11]     In addition to surveillance notes, investigators made a video cassette recording of plaintiff's activities.  Before ruling on defendant's Motion for Summary Judgment, the court personally viewed the video.

surveillance records, plaintiff's activities lasted in duration from a few minutes to approximately four hours.  (*See* Pl.'s Brief at 4-6, Exh. B & C to Barr Aff.)

### 2.   Meeting With Plaintiff To Discuss Returning To Work

On July 27, 2000, Barr and Leon Eskridge, EEO Officer, met with plaintiff to discuss his work status. (Pl. Dep. at 92; Barr Aff. ¶ 7.)  In the meeting, plaintiff stated that he was "lack[ing] energy and stamina." (Exh. D to Barr Aff.)  Barr and Eskridge asked plaintiff if he could return to his regular job duties as a crane operator, and plaintiff responded that he could not. (Exh. D to Barr Aff.; Pl Dep. at 93.)  During the July 27, 2000, meeting Barr also asked plaintiff if he could perform some type of transitional duty assignment.[12]  (Pl. Dep. at 92-93; Exh. D. to Barr Aff.)  Plaintiff responded that did not think he could because of his condition. (*Id.*)  He told Barr that  he was under the care of Drs. Pitts, Stroud, and Hagemeyer, to determine what his problem was, that his prescribed medicines affected his ability to get up in the mornings and made him feel drugged, that he could not get on a schedule because he didn't know how he was going to feel from day to day,  and that if "[Barr] wanted [him] out there to punch the clock at eight o'clock every morning and sit out there until four thirty," he could not do that.  (*Id.*)

### 3.   Report That Plaintiff Could Perform His Regular Job Duties

On July 31, 2000, Charles Tuggle, Supervisor of the Melting Department, and Ron Kern,

---

[12]  "Transitional duty" is a program ACIPCO offers to accommodate employees who have temporary limitations that prevent them from performing their regular job. (Exh. 9 to Pl. Dep.)  In transitional duty, employees report to work, and when available, complete short-term, light-duty assignments. (*Id.*)  When no assignments are available, employees on transitional duty improve their personal skills by reading, listening to audiotapes, watching videotapes, taking computer tutorials, or attending skill enrichment classes. (*Id.*; Pl. Dep. at 82.) Plaintiff admits that some days transitional duty consists of sitting around drinking coffee and eating doughnuts. (Pl. Dep. at 83.)

Assistant Superintendent of the Melting Department, reviewed the surveillance videotape.   (Barr Aff. ¶ 8; Exh. 1. to Barr Aff.; C. Tuggle Aff., attached as an Exh. to Def.'s Mot. for Summ. J.) They determined that the work plaintiff performed in the surveillance video was more demanding than the work required of plaintiff in his regular job as a crane operator.  (*Id.*)

### 4.    Inconsistencies In What Plaintiff Told His Treating Physicians

On July 31, 2000, Dr. Pitts, plaintiff's primary physician, viewed the surveillance tape. (Exh. 1 to  Dr. Pitts Aff., attached as Exh. to Def.'s Mot. for Summ. J.)  After viewing it, Dr. Pitts indicated that what plaintiff told him about his abilities was inconsistent with his activity on the tape.  (Dr. Pitts Aff. ¶ 2.)

Plaintiff's other primary physician, Dr. Ronald Stroud, viewed the surveillance tape on August 9, 2000.  (Dr. Ronald Stroud Aff. ¶ 2, attached as an Exh. to Def.'s Mot. for Summ. J.) He states that the "activities demonstrated in the video are not consistent with what plaintiff told me of his abilities."  (Dr. Stroud Aff. ¶ 2.)

### G.    Referral To The Discipline Committee

Tuggle, as Supervisor of the Melting Department, referred plaintiff's case to the Discipline Committee for further review on August 14, 2000.  (Exh. 1 to Barr Aff.)  Tuggle recommended that plaintiff be discharged for providing false information to ACIPCO and causing ACIPCO to incur increased costs[13] in violation of Plant Rule Seven.  (Exh. 1 to Barr Aff.)

---

[13]   During his five months of leave, plaintiff was paid $8,765.25 in sick pay.  (Barr Aff. ¶ 12.)

### H.   Termination Of Plaintiff's Employment

Plaintiff met with the Discipline Committee and viewed the surveillance tape. (Pl. Dep. at 94-95; Exh. 1 to Barr Aff.)  On August 17, 2000, plaintiff met with Barr to discuss his meeting with the Discipline Committee.  (Exh. 1 to Barr Aff.)  Barr explained that Tuggle recommended his discharge to the Discipline Committee because Eady provided false information regarding his abilities to Barr, Leon Eskridge, Dr. Pitts, and Dr. Stroud.  (Pl. Dep. at 119; Exh. 1 to Barr Aff.)

Following its investigation, the Discipline Committee met on August 18, 2000, to discuss the plaintiff's alleged violation of Plant Rule Seven.  ( Exh. 1 to Barr Aff.)  The Committee was composed of four members of management, four members of the Board of Operatives, non-management, and Charles Tuggle, plaintiff's department head.  (Exh. 1 to Barr Aff.)  The Committee unanimously[14] approved the recommendation to terminate plaintiff's employment for violation of Plant Rule Seven.  (*Id.*)  The Discipline Committee determined that plaintiff caused ACIPCO to pay increased sick pay because he provided false information to Barr, Eskridge, Dr. Pitts, and Dr. Stroud in violation of Plant Rule Seven.  (Exh. 1 to Barr Aff.)  Plaintiff's superintendent called him into work, informed him that he was being terminated, and showed the video viewed by the Discipline Committee to him.  (Pl. Aff. ¶ 11.)  Plaintiff was not given an opportunity to respond.  (*Id.*)

Plaintiff admits that ACIPCO terminated him because the company concluded that he was engaging in greater physical activity than his physicians allowed him while on medical leave.  (Pl. Dep. at 98-99.)  Plaintiff stated that he has no reason to disbelieve that ACIPCO

---

[14]  If the vote had not been unanimous, the matter would have been referred to the Board of Management, which is comprised of members of management, for further discussion.  (Def.'s Brief at 10; Pl.'s Brief at 10.)

terminated his employment for this reason. (*Id.*)  Plaintiff testified that no one at or with ACIPCO said anything to lead him to believe that his employment was terminated for participating in an employment benefit plan. (Pl. Dep. at 119-20.)  However, plaintiff denies that he lied to ACIPCO about his physical capabilities while he was on medical leave. (Pl. Dep. at 119, 126-27.)  Plaintiff believes he was terminated because of the trouble between Jensen and him and because of his sick leave. (Pl. Dep. at 117-28.)

## I.    Plaintiff's Claims

Plaintiff filed this lawsuit on September 21, 2000, alleging that ACIPCO terminated his employment with the purpose of interfering with his right to benefits under an employee benefit plan, in violation of Section 510 of ERISA.  Plaintiff originally made state law claims of assault and battery, and outrage, but those claims are due to be  dismissed. (*See* discussion, *supra*, at n.1.)

## J.    Plaintiff's Motion For Refusal Of Defendant's Application For Summary Judgment Or, In The Alternative, Continuance

Defendant filed its Motion for Summary Judgment on September 28, 2001, more than a year after plaintiff filed his complaint. (*See* Def.'s Mot. for Summ. J.)  On October 19, 2001, plaintiff filed a Motion for Refusal of the Defendant's Application for Summary Judgment Or, in the Alternative, Continuance.  (*See* Mot. for Refusal of the Def.'s Application for Summ. J. Or, in the Alternative, Continuance.)  Plaintiff's counsel, James M. Wooten, filed an affidavit in support of the Motion. (*See* Wooten Aff.)   In his affidavit, Wooten stated that defendant attached the affidavits of Dr. Pitts, Dr. Stroud, Leann Barr, and Charles Tuggle in support of its Motion for Summary Judgment. (Wooten Aff. ¶ 4.)   Wooten indicated that a continuance was necessary to allow him to depose the four individuals so that he could adequately respond to

defendant's Motion for Summary Judgment. (Wooten Aff. ¶ 11.)

Plaintiff filed his lawsuit on September 21, 2000. (*See* Compl.)  The original scheduling Order was entered on November 29, 2000, and the original discovery deadline was June 29, 2001. (*See* Scheduling Order entered November 29, 2000, at ¶ 3.)  Defendant provided plaintiff its initial disclosures on December 1, 2000, and Dr. J.W. Pitts, Dr. Ronald Stroud, Leann Barr, and Charles Tuggle were specifically identified. (*See* Def.'s Initial Disclosures.)  Dr. J.W. Pitts, Dr. Ronald Stroud, and Leann Barr were also listed in plaintiff's initial disclosures. (*See* Pl.'s Initial Disclosures.)   On June 25, 2001, the court modified its scheduling order and moved the discovery deadline to September 4, 2001, because plaintiff's original attorney withdrew from the case. (*See* June 25, 2001, Order.)  Wooten was retained as plaintiff's counsel on July 23, 2001. (*See* Pl.'s Mot. to Compel ¶ 4.)  By July 23, 2001, plaintiff had not noticed any depositions in this case. (*See* Def.'s Mot. for Expedited Protective Order.)  On July 30, 2001, plaintiff noticed the depositions of eight individuals -  Ron Kern (Assistant Superintendent, Melting Department); Dr. J.W. Pitts (Medical Director); Charles Tuggle (Superintendent, Melting Department); Tommy Albright (Supervisory, Employee Services); Arthur Edge (Vice-President and Works Manager); Glenn Gardner (Assistant Works Manager); Leann Barr (Director of Human Resources); and Dr. Ronald Stroud (who is no longer employed with ACIPCO) - to be taken on August 20 and 21, 2001. (*See* Def.'s Mot. for Expedited Protective Order, n.1.)  Plaintiff's counsel did not confer with counsel for defendant prior to arranging the deposition dates, and defense counsel was not available on those dates. (*See* Def.'s Mot. for Expedited Protective Order.)

In correspondence to plaintiff's counsel, defense counsel represented that he would be available on August 29 and August 30 but that he did not know the availability of ACIPCO's witnesses.  (*See* Def.'s Mot. for Expedited Protective Order.)  On August 17, 2001, plaintiff's counsel re-noticed the depositions of the eight individuals for August 29 and August 30, 2001, the last week before the discovery cut-off deadline.  (*Id.*)  The court ordered defendant to produce for deposition those witnesses whose schedule would accommodate plaintiff's deposition notices.[15]  (*See* Sept. 4. 2001, Order.)  Plaintiff was able to depose Gardner and Albright but was not able to take the remaining depositions prior to the discovery cut-off.  (*See* Mot. for Refusal of the Def.'s Application for Summ. J. Or, in the Alternative, Continuance.)

The court has broad discretion over the management of pre-trial activities, including discovery and scheduling.  *Chrysler Intern Corp. v. Chemaly*, 280 F.3d 1358, 1360 (11th Cir. 2002); *Johnson v. Bd. of Regents of Univ. Sys. of Ga.*, 263 F.3d 1234, 1269 (11th Cir. 2001); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417 (11th Cir. 1998); *Iervolino v. Delta Air Lines*, 796 F.2d 1408 (11th Cir. 1986).  Plaintiff waited more than ten months to notice any depositions in this case.  The discovery deadline was extended once to accommodate plaintiff, but because plaintiff waited until the close of discovery to notice any depositions, the court exercised its discretion and decided not to extend the discovery deadline a second time.  Plaintiff raised no legitimate reason for his lack of diligence in conducting discovery in this case.

---

[15]  On August 23, 2000, defendant filed a Motion for Expedited Protective Order to protect defendant from producing seven individuals for deposition on August 29 and 30, 2001. (*See* Mot. for Expedited Protective Order.)  On August 24, 2001, plaintiff filed a Motion to Compel Or, in the Alternative, Motion for Extension of Scheduling Order Deadlines asking the court to either compel defendant to produce the eight individuals for deposition or to extend the discovery deadline. (*See* Mot. to Compel Or, in the Alternative, Mot. for Extension of Scheduling Order Deadlines.)

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986.)  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* Fed.R.Civ.P. 56(a) and (b).  Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324.  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

In deciding a motion for summary judgment, the role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury. *Id.*  Therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  The nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

12

### III.  ERISA CLAIM

Under ERISA it is unlawful "to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled."  *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993) (*quoting* 29 U.S.C. § 1140).  "The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights."  See *Clark*, 990 F.2d at 1222 (citation omitted). Whether the employer intended to interfere with an employee's right to future benefits requires an inquiry into the facts surrounding his discharge.  *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 546 (11th Cir. 1993).  Plaintiff is not required to prove that "interference with ERISA rights was the sole reason for the discharge."  *Clark*, 990 F.2d at 1222-23.  He "must show more than the incidental loss of benefits as a result of a discharge."  *Id.*  A plaintiff can meet his burden by showing direct proof of discrimination or by satisfying the tripartite scheme for circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Clark*, 990 F.2d at 1223; *see also* 29 U.S.C. § 1140.

Direct evidence is evidence sufficient to prove discrimination without inference or presumption.  *Clark*, 990 F.2d at 1223 (citing *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989)).  Plaintiff testified that no one at or with ACIPCO said anything that led him to believe that his employment was being terminated for his participation in an employee benefit plan.  (Pl. Dep. at 119-20.)  In fact, plaintiff does not dispute that ACIPCO discharged him because it concluded that he was engaging in greater physical activity than his doctor allowed

13

while he was on medical leave. (Pl. Dep. at 99.)  Although plaintiff opines that ACIPCO

terminated him because of his conflicts with co-worker Jensen and his medical leave, plaintiff

testified that he has no reason to disbelieve ACIPCO's reason for terminating his employment.

(Pl. Dep. at 99, 117-28.)  Plaintiff has presented no direct evidence of discrimination.

Because no direct evidence supports his claim, plaintiff must prove his case through

circumstantial evidence, which requires the plaintiff to first establish a prima facie case of

discrimination. *Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000).  To prove a

prima facie case of ERISA discrimination, plaintiff must show:

> (1) that he is entitled to ERISA's protection, (2) was qualified for the position,
> and (3) was discharged under circumstances that give rise to an inference of
> discrimination.

*Clark*, 990 F.2d at 1223; *Short*, 961 F. Supp. at 265.  If plaintiff establishes a prima facie case of

discrimination, a presumption of discrimination arises and defendant must then articulate a

legitimate, nondiscriminatory reason for its conduct. *See Clark*, 990 F.2d at 1223; *Gitlitz v.

Compagnie Nationale Air France*, 129 F.3d 554, 559 (11th Cir. 1997).  If defendant articulates a

legitimate, nondiscriminatory reason for its conduct, the presumption of discrimination

disappears, and plaintiff must show that the reason given was a mere pretext for discrimination.

*Clark*, 990 F.2d at 1223.

### A.    Prima Facie Case

To establish a prima facie case, the  employee must prove that he is qualified for the job

at issue. *Clark*, 990 F.2d at 1223; *Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 261

(5th Cir. 2001).  The employee must be able to show that he can perform the job at issue, either

with or without accommodation. *Id.*  When a plaintiff cannot prove that he is qualified to

perform his regular job duties, he cannot establish a prima facie case of discrimination, and his

ERISA claim must fail. *Id.*; *Hamilton v. Mecca, Inc.*, 930 F.Supp. 1540 (S.D. Ga. 1996).

Eady admitted that at the time of his discharge he could not perform his regular job duties

as a Hot Metal Crane Operator. (Pl. Dep. at 93.) He repeatedly asserted this fact to his doctors,

Pitts and Stroud, and was placed on medical leave because of it. (Exh 3 to Pl. Dep.) When in

late July 2000, just two weeks before his discharge, Human Resources Director Barr specifically

asked if he could perform his regular job as a Hot Metal Crane Operator or transitional duty,

plaintiff responded that he could not perform either. (Pl. Dep. at 92-93; Exh. 11 to Pl. Dep.; Exh.

1 to Barr Aff.) Because plaintiff has not shown he was qualified to perform his regular job

duties, either with or without accommodation, he does not establish a prima facie case.

To establish the prima facie case, plaintiff must also show that he was terminated "under

circumstances that give rise to an inference of discrimination." *Clark*, 990 F.2d at 1223.

Although plaintiff need not prove discriminatory intent, he must present evidence to suggest that

interference with plaintiff's ERISA rights was a motivating factor. *Id.* To raise such an

inference, plaintiff cannot simply show that as a result of the termination, he was deprived of the

opportunity to accrue more benefits. *Id.* Rather, the plaintiff must introduce evidence that the

employer's decision was directed at his ERISA rights in particular. *Id.*

Plaintiff has not established a prima facie case because he has provided no evidence or

facts that give rise to an inference of discrimination. Although plaintiff opines that ACIPCO

terminated him, in part, because of his medical leave, (Pl. Dep. at 122), plaintiff must show that

the employer's decision was directed particularly at his ERISA rights, *Clark*, 990 F.2d at 1224.

The incidental loss of future medical, dental, and life insurance benefits and participation in

ACIPCO's profit-sharing plan as a result of the discharge are not sufficient to create the necessary inference of ERISA discrimination. *See id.* Plaintiff's prima facie case fails.

### B.     Legitimate, Nondiscriminatory Reason

Even assuming a prima facie case of discrimination, defendant has articulated a legitimate, nondiscriminatory reason for terminating plaintiff's employment. ACIPCO maintains that it terminated plaintiff for giving false information to the company in violation of Plant Rule Seven. Plaintiff has presented no evidence that defendant's legitimate, non-discriminatory reason for terminating him is pretext, and summary judgment is due to be granted.

After investigation of a report that plaintiff was engaging in physical activity beyond what he represented to ACIPCO and his treating physicians, ACIPCO's Discipline Committee voted unanimously to discharge plaintiff. (Exh. 1 to Barr Aff.) The Discipline Committee and plaintiff's doctors reviewed a surveillance video that showed plaintiff cleaning box fans in temperatures near or exceeding 100 degrees, restocking shelves and emptying trash at a local convenience store, sunbathing at a community swimming pool, shopping at local drug, discount, and grocery stores, mowing and edging his lawn, and cleaning his driveway, gutters, eaves, and truck mats in temperatures near or exceeding 100 degrees. (Barr Aff. ¶ 6; Exh. B. to Barr Aff.) The Discipline Committee and plaintiff's doctors concluded that plaintiff's activities were inconsistent with his representation to ACIPCO and his doctors that he was unable to perform his regular job or transitional duty. (*Id.*; Pl. Dep. at 83.) Because defendant believed plaintiff misrepresented his ability to work, which resulted in him being placed on medical leave with sick pay, he was discharged for violation of Plant Rule Number Seven, which specifically

provides for discharge on the first offense for providing false reports or information resulting in a loss or potential loss to defendant. (Exh. 1 to Barr Aff.) As noted above, plaintiff admits that he has no reason to disbelieve that defendant discharged him for this very reason. (Pl. Dep. at 99.)

Assuming as true plaintiff's speculation that ACIPCO was "frustrated at the incident between [him] and Mike Jensen" and about his not being able to come back to work at the time, and "might have been out to get [him]," (Pl. Dep. at 120-21), the claim still fails. Neither a frustration with the personality clash between plaintiff and Jensen nor a desire to punish plaintiff for not returning to work following his suspension in any way suggests an effort to interfere with plaintiff's ERISA rights. Plaintiff's only "evidence" that ACIPCO sought to interfere with his rights under an employee benefit plan is his disagreement with ACIPCO's conclusion that he lied regarding his physical capabilities while he was on medical leave. (Pl. Dep. at 117-119, 126-27.) However, the fact that Barr, the Discipline Committee, and plaintiff's treating physicians disagreed with plaintiff's professed inability to work does not suggest that ERISA discrimination was at the root of the decision to discharge Eady. A "plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F. 3d at 1030. Moreover, "[a]n employer's good-faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination." *Clark*, 990 F.2d at 1228; *see also Chapman*, 229 F.3d at 1030. Finally, an "employer may fire an employee for a good reason,

17

a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (emphasis added).  Because plaintiff has neither established a prima facie case of ERISA discrimination nor rebutted defendant's articulated reason for his discharge, his claim is due to be dismissed.  Plaintiff has done no more than quarrel with defendant's legitimate, nondiscriminatory reason, and Defendant's Motion for Summary Judgment is due to be granted.  *Chapman*, 229 F.3d at 1030, 1037 ("to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual).

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant is entitled to judgment as a matter of law.  An order granting Defendant's Motion for Summary Judgment and dismissing plaintiff's state law claims will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of September, 2002.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

18